THE STATE OF WYOMING

*Plaintiff and Respondent*

vs.

JAMES H. POSEY

*Defendant and Appellant.*

(No. 2765; August 27th, 1957; 314 Pac. (2d) 833.)

For the defendant and appellant, the cause was submitted upon the brief of Lathrop & Lathrop and James A. Tilker of Cheyenne, Wyoming, and Whitley & Liamos, of Newcastle, Wyoming; oral argument by Mr. James A. Tilker and Mr. Carleton A. Lathrop.

For the plaintiff and respondent, the cause was submitted upon the brief of George F. Guy, Attorney General, Howard B. Black, Deputy Attorney General, Arthur F. Fisher, Ellen Crowley, Bruce P. Badley, Assistant Attorneys General, all of Cheyenne, Wyoming, and Chester S. Jones, County Attorney of Weston County, and Richard S. Dumbrill, Deputy County At-

260

torney of Weston County, Wyoming; oral argument by Mr. Bruce P. Badley and Mr. Richard S. Dumbrill.

Heard before Blume, C.J., and Harnsberger and Parker, J.J.

## OPINION

Mr. Justice HARNSBERGER delivered the opinion of the court.

Defendant Posey, charged with and convicted of feloniously uttering a check for $1,000, with intent to defraud the payee, knowing at the time he did not have sufficent funds or credit with the drawee bank, appeals. He relies upon a number of alleged errors, but we think it sufficient to consider only a matter of excluded evidence and his claim that the court erroneously and prejudicially instructed the jury.

Defendant and a partner (Wegher) were in the plumbing business, operating under the trade name Black Hills Plumbing & Heating. He was extended credit in his purchase of material from a local plumbing supply business (Wyoming Gas Service), and became indebted to it for approximately $2,800. On April 27, 1954, defendant gave his check to the supply house for $1,000, drawn against his account in a local bank carried under the trade name Black Hills Plumbing & Heating and received credit for $413.32 to take up a check previously given by him but which had not been paid, and $586.68 to be applied against his account. At the same time defendant also made additional purchases, the charge for which was added to his account. The $1,000 check was presented to the bank the following day, April 28, 1954, and payment refused. The record fails to show that payment was refused because of defendant's lack of sufficient funds

or credit with the bank, although the assistant cashier of the drawee bank was permitted to testify over defendant's objection and exception that a conclusion was called for: "If the check was presented on April 28, 1954, this State's Exhibit No. 1 in the amount of $1,000, drawn against the account of Black Hills Plumbing & Heating, it would not have been payable according to the records." It is interesting to note that this same witness was *not* permitted to testify and the court *sustained* an identical objection by the State to his answering a similar question regarding a later presentation of the same check. The witness also testified defendant's deposits from April 10, 1954, through April 26, 1954 totaled $3,086.93, with no transactions shown on April 27, 1954, and that the total checks against the account during that period amounted to $2,602.08, so that at the close of business on April 27, 1954, there was a credit balance in the account of $484.85. The $1,000 check was again presented on June 14, 1954, when payment was refused and a notation given that there were "not sufficient funds". Other presentations were made on June 22, 1954, and June 27, 1954, and on each of these occasions payment was refused because of insufficient funds.

The defendant and his partner dissolved their relationship some time in April, 1954, and in settlement of their affairs, defendant signed two checks drawn against his account carried under the trade name, each for $450.00. One of these checks was to be paid out of money to be received from the "Pillen's job" and the other was to be paid out of the "Wolfe job".

Mrs. Pillen, called as a witness for the defense, identified her check made payable to the Black Hills Plumbing & Heating and Buck Brownlow for $934.27. She testified the check was paid by the bank, and that

she had drawn and signed it. The check bore endorsement by ink signature "Buck Brownlow" under which was typed "Deposit to account of Black Hills Plumbing & Heating, $34.27 and to Wm. Wegher $900.00". Brownlow was the contractor for the Pillen house wherein the defendant and his partner Wegher had done the plumbing. On the face of the check there was typed "In full on house contract for plumbing and heating". By what authority Brownlow made the division indicated beneath his signature is not shown, and it remains a mystery why the bank paid the check on the sole endorsing signature of Brownlow and credited only $34.27, instead of the full $934.27, to the defendant payee's account, as the testimony of the bank's cashier shows was done.

If the $934.27 had gone into defendant's account, that amount, when added to defendant's April 27, 1954, balance of $484.85 would have made the total of defendant's account at the time the check was drawn $1,419.12, an amount more than sufficient to pay the $1,000 check in full. Even if the $450.00 check, given to Wegher to be paid from the Pillen job, had been paid prior to the presentation of the $1,000 check, it would have left a balance of $969.12 in the account. It may be doubted that failure of payment because of so small a shortage as $30.88 would have persuaded the jury there was an intention to defraud on the part of a man the supply company had deemed worthy of trust and credit to the extent of $2,800, and to whom other evidence showed the company extended further credit even after payment of the $1,000 check had been refused.

We do not overlook that the defendant's offer in evidence of the Pillen check was refused by the court, and that it was again refused following a further offer

when there was the additional testimony of the bank's official who identifed the check and its endorsements and coupled the check with entries in the defendant's bank account, but these refusals were erroneous, and such refusals in themselves were prejudicial.

It further appears that within two days following the giving of the $1,000 check, the defendant paid the supply company approximately $522.00, which he received from the Wolfe job. If this payment be added to the $969.12, the amount of defendant's account on June 27, 1954, might properly have totaled $1,491.12. This would be an amount sufficient to have paid the second Wegher check of $450.00, as well as the $1,000 check, and still leave a credit balance of some forty odd dollars.

We probably would not disturb the jury's verdict even in the face of this strong evidence of an absence of intent to defraud, had that evidence been admitted and submitted to the jury. It may be that we would not disturb the jury's verdict even though it was rendered without the jury's being permitted to have the evidence concerning the $934.27 check. However, when a jury, sworn to receive as controlling the court's instruction as to the law of the case, has been erroneously instructed and brings in a verdict of guilty, a different situation is presented.

The criticized instruction numbered 11A, is as follows:

"You are instructed that as against the maker or drawer of a check, draft or order for the payment of money, the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee or the bank upon which the check is drawn, when presented in the usual course of business, shall be prima facie evidence of intent to defraud and knowledge of insufficient funds in or credit with such

bank or other depository, provided such maker or drawer shall not have paid the drawee or the person to whom the check is payable thereof the amount due thereon upon such presentment."

This instruction told the jury that the *refusal* of the bank to pay the check was prima facie evidence the defendant intended to defraud. It also told the jury that such refusal was prima facie evidence the defendant *knew*, when he made the check, that he was without sufficient funds or credit with the bank to pay the check in full. It might also be understood as saying that if defendant thereafter made payment to either the drawee or the payee, of the amount which was due upon the check's presentment, there was no intention to defraud. That adds up to saying the act of a third party would establish prima facie, the defendant's guilty purpose, but that the defendant might later gain absolution by buying off either drawee or the payee. This has never been the law.

Our statute relating to the offense is as follows:

"Whoever, with intent to defraud by obtaining money, merchandise, property, credit, or thing of value, although no express representation is made in reference thereto, or who in the payment of any obligation, shall make, draw, utter or deliver any check, draft or order for the payment of money in the sum of seventy-five dollars ($75.00) or upwards upon any bank, depository, person, firm or corporation, knowing at the time of such making, drawing, uttering or delivering that the maker or drawer has not sufficient funds in or credit with such bank, depository, person, firm or corporation for the payment of such check, draft or order in full upon its presentation, shall be guilty of a felony and upon conviction thereof shall be fined not more than five thousand dollars ($5,000.00) or imprisoned in the penitentiary for not more than five (5) years or both." § 9-908, W.C.S. 1945, as amended Laws 1953, ch. 198, § 1.

Section 9-909, W.C.S. 1945, which was also amended by Session Laws 1953, ch. 198, § 2, follows and deals with a similar offense of the lesser grade of misdemeanor. Section 9-910, W.C.S. 1945, provides:

"The making, drawing, uttering or delivering of such check or draft or order *as aforesaid* shall be prima facie evidence of intent to defraud. The word 'credit' as used herein shall be construed to mean an arrangement or understanding with the bank, depository, person, firm or corporation for the payment of such check, draft or order." (Italics supplied)

The statute, therefore, only makes it a crime to knowingly give an insufficient check whether to obtain money, merchandise, property, credit or thing of value or in payment of an obligation. However, in either case, in order to gain the advantage of § 9-910, supra, and make a prima facie showing of the fraudulent intent, it is necessary for the State to show (1) the defendant uttered the check, and (2) defendant *knew* at the time, he had neither funds nor credit with the drawee to pay the check in full. Proof of this is indispensable and this proof must be made by competent evidence. The mere utterance of a check is not enough. It must be coupled with scienter. The bank's refusal to pay the check was, by itself, wholly insufficient as evidence to prove that necessary fact. Much less was it proof that defendant had knowledge of any insufficiency in his account or credit. The statute does not make refusual of payment prima facie evidence of anything, and there is no rule of law within our knowledge, which makes such a refusal prima facie evidence of anything or that raises it as a presumption. It is the *fact* of defendant's *knowledge* which brings the check within the pattern of a fraudulent check as fixed by § 9-908, supra—not the bank's refusal of payment.

In the absence of an express statute declaring that refusal of payment creates the presumption the defendant had that *knowledge* when he uttered the check, it is difficult to see why such a refusal should impute any such knowledge. As the defendant says "There is no relationship between (1) bare refusal of a drawee bank to pay a check and (2) knowledge of insufficient funds, * * *"; for, refusal to pay may have been for any one or more of a great number of reasons completely disassociated with the amount of money defendant had in his account subject to payment in full of the check or sufficient credit with the bank for that purpose. In consequence, the instruction incorrectly stated the law and thereby prejudiced the right of the defendant. We cannot know to what extent the instruction influenced the jury, but we must assume the instruction may have misled its members into rendering a verdict which they might not otherwise have returned. Without the instruction, the jury may have concluded there was insufficient proof of any intent to defraud. They may have accepted the defendant's version of the matter that he had no purpose or intent to defraud, but was merely trying to pay his just debts as and when his own debtors in their turn met their obligations to him. Just debts should be paid and the law is adequate to compel their payment where there is an ability to pay, but the criminal law is not a process to be subserved for that purpose. Imprisonment for debt is no longer a part of our law.

We consider that the giving of the erroneous instruction was prejudicial and the verdict of the jury is, therefore, set aside, the judgment and sentence of the court is reversed and the case remanded for a new trial.

Reversed and remanded.